601 A.2d 1275

**COMMONWEALTH of Pennsylvania**

v.

**Angelo GREKIS, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1991.

Decided Jan. 14, 1992.

496

Raymond Radakovich, Pittsburgh, for appellant.

James R. Gilmore, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before CAVANAUGH, BECK and KELLY, JJ.

BECK, Judge:

Appellant Angelo Grekis was tried and convicted by a jury of nineteen (19) separate counts of both receiving stolen property[1] and nineteen (19) separate counts of criminal conspiracy.[2] The convictions arose as a result of a fencing operation involving the receipt and sale of stolen cigarettes by the operators of the Quick Stop restaurant in Pittsburgh. The primary issue at trial and on appeal is the sufficiency of the proof of appellant's participation in and knowledge of the fencing operation. Following the denial of post-trial motions, appellant was sentenced to consecutive terms of imprisonment on fourteen counts of receiving stolen property and concurrent terms of imprisonment on the remaining receiving stolen property counts. Appellant was sentenced to no further penalty on the conspiracy convictions. The aggregate term of imprisonment, therefore, was three and one half (3½) to twenty-eight (28) years. Appellant's motion to modify sentence was subsequently denied. This appeal followed.

The evidence upon which appellant was convicted established the following. Lance Neuring was a burglar and a thief who forcibly entered numerous stores in Pittsburgh

1. 18 Pa.C.S.A. § 3925 (Purdon 1983).
2. 18 Pa.C.S.A. § 903 (Purdon 1983).

between August 16, 1987, and February 19, 1988,[3] and stole in excess of 1600 cartons of cigarettes.[4] Each carton contained ten packs of cigarettes. After each burglary, Neuring took his spoils to the Quick Stop restaurant where he sold the cigarettes for $5.00 a carton. Neuring had arranged for the delivery and sale of the stolen cigarettes with George Lignos, appellant's brother-in-law, who was on the premises and apparently in charge during the early morning hours when the deliveries customarily took place. The Commonwealth's theory of the case against appellant was that he was the actual owner and operator of the Quick Stop restaurant and that although George Lignos was the immediate physical conduit for the receipt and purchase of the stolen items, appellant had constructive possession of the stolen goods and reaped the benefit of their sale.

Neuring ordinarily delivered the sizable quantities of stolen cigarettes to the Quick Stop in large plastic bags or drums. He brought them upstairs to a storage-type area where electronic surveillance equipment oversaw the restaurant. Neuring originally met Lignos at the Quick Stop restaurant when a friend had suggested to him that the Quick Stop would be a place interested in purchasing the stolen merchandise. Neuring negotiated the $5.00 a carton price with Lignos and thereafter would call Lignos after the completion of each burglary and theft. Neuring usually took the cigarettes to the Quick Stop in the early morning hours, around one or two a.m., or even later. During the

3. Each of the burglaries during which the cigarettes were stolen was established by direct evidence at trial. An owner or representative of each burglarized establishment testified regarding the manner of breaking and entering and the number of cartons of cigarettes stolen. Each owner also testified that neither Lance Neuring nor any of the parties connected with the Quick Stop restaurant had permission to obtain the missing merchandise. Also each owner identified the wholesale cigarette supplier whose tax stamp number would have been on each stolen pack. Thus the fact that the cigarettes were stolen, an essential element of receiving stolen property, was established by this testimony and the testimony of the thief himself. In fact, this element was never really a contested aspect of proof at trial.

4. At the time of appellant's trial, Neuring was serving a five to fifty year sentence for a series of burglaries including the ones implicated in the instant case.

six month period at issue here, Neuring would bring the stolen cigarettes to the Quick Stop each time he burglarized one of the victimized stores. In fact, at trial Neuring was questioned about each specific burglary location and date and affirmatively testified that on each occasion he brought the stolen cigarettes to the Quick Stop restaurant. He estimated that this occurred two or three times a week and that the average booty each time amounted to one hundred cartons of cigarettes, more or less.

The cigarettes thus sold to the Quick Stop were then re-sold by the individual pack for approximately $1.25 a pack. The stolen cigarettes were stored and sold from behind the cigarette and candy counter towards the rear of the restaurant. Occasionally George Lignos was not available to transact business with Neuring and at those times Sterios Mavroides, a younger relative, would take the cigarettes and pay Neuring.

Lance Neuring testified at trial that he never sold cigarettes directly to appellant. Neuring testified that he didn't really know appellant and that appellant was not present when his dealings with Lignos were transacted. Neuring indicated that from what he understood, appellant "just worked during the day" and, as previously indicated, Neuring's business took him to the Quick Stop very late at night. However, in a previous statement to the police, Neuring indicated that although he never sold cigarettes to appellant, he saw him in the store periodically and had approached him on one occasion to see if he would arrange a transaction in Lignos' absence. According to the police statement, appellant told Neuring that Neuring should just keep dealing with Lignos. This incident was denied by Neuring at trial who maintained that he never had anything to do with appellant. In any event, the evidence was undisputed that Neuring did not directly sell the contraband to appellant. The Commonwealth never asserted otherwise, and based its case instead on a theory of constructive possession and conspiracy.

The two police officers chiefly responsible for investigating the case against appellant were Detective Howard Parsons and Detective John Balobeck, each of whom testified for the Commonwealth. Parsons is a twenty-two year veteran of the Pittsburgh police department and spent the majority of that time investigating burglaries. Parsons testified that Lance Neuring confessed to the burglaries after being arrested on unrelated charges. In his confession, Neuring identified the Quick Stop as the locale for disposal of the stolen items and indicated to police the nature of his arrangement with Lignos and Mavroides. As a result of Neuring's disclosures, more than 600 cartons of stolen cigarettes were seized by the police from the Quick Stop.[5] The cigarettes were recovered from racks at the rear of the restaurant, where cigarettes and candy were sold to the public.

Detective Parsons was very familiar with the Quick Stop restaurant and with Angelo Grekis, the appellant. Parsons stated that he had had many conversations, "probably two dozen", with Angelo Grekis and that "on more than one occasion" appellant had indicated to the detective that he was the owner of the Quick Stop and that it was "his establishment." Parsons also testified that appellant had stated to him that George Lignos was the night manager of the Quick Stop but that subsequent to Lignos' arrest on these charges, appellant had fired him.[6] To Parsons, the import of appellant's remarks was that the Quick Stop was "[appellant's] establishment solely and that George Lignos and Sterios Mavroides were employees of it." Parsons also testified that one evening he was watching the news on television when he saw appellant interviewed. Apparently,

5. The business records of the Quick Stop which were turned over to police after the cigarettes were seized, accounted for the legitimate purchase of only a tiny fraction of the cigarettes. Moreover, the tax stamps on the cigarettes seized indicated that they came from 65 different distributors although Quick Stop legally purchased from only two distributors.

6. Lignos and Mavroides each pled no contest to receiving stolen property and had been sentenced to probation prior to appellant's trial.

appellant was in a newsworthy dispute with another business owner in the neighborhood. During the course of the television interview, appellant plainly indicated that the Quick Stop was "his establishment."

On cross-examination, in response to defense counsel's persistent questioning regarding how the detective knew that appellant "owned" the Quick Stop, Parsons answered that the fact that appellant "owns and runs" the Quick Stop is "common knowledge throughout our department, ... common knowledge in the street, and by his own admission." Parsons noted that the area in which the Quick Stop is located is a focus of a great deal of law enforcement activity and that, as a result, he and his partner go past the restaurant on many occasions. Parsons stated that on most occasions, appellant can be observed either inside the Quick Stop or standing out in front of it. Parsons also stated that when George Lignos was questioned subsequent to his arrest in this case, Lignos said that appellant owned the Quick Stop restaurant and that he (Lignos) had worked there since appellant opened the business.

Through Detective Parsons, the Commonwealth also introduced evidence of a license issued by the City of Pittsburgh for electrical/mechanical/music/video devices located at the Quick Stop restaurant. The license was issued to Angelo Grekis and listed him as owner. The license had been seized by the police from the Quick Stop restaurant.

The Commonwealth also called George Lignos as a witness. As noted above, Lignos is appellant's brother-in-law and is the person with whom Neuring dealt directly. Immediately following his arrest, Lignos gave a statement to the police in which he indicated that appellant was the proprietor of the Quick Stop and that he, Lignos, was "only the manager at night for him." This meant that Lignos was at the Quick Stop from nine at night until nine in the morning. In the same statement to police, Lignos indicated that he took the money to pay Neuring for the stolen cigarettes out of the cash register at the Quick Stop. At the close of his

direct examination, Lignos confirmed that the statement that he gave police after arrest was accurate.

On cross-examination by defense counsel, however, Lignos testified that appellant knew nothing about the cigarette buying scheme and that it was something that he devised by himself in order to have extra money to spend at the race track. Further, Lignos testified that, despite what he had told police regarding the proprietorship of the Quick Stop, he and his sister, appellant's wife, really owned the restaurant and that appellant had no ownership interest in it. In fact, Lignos stated that he owned 51% of the corporation's stock and appellant's wife owned the remaining 49% of the stock. The testimony was that the stock, which originally had been in appellant's name, was transferred to Lignos in 1985. Further, Lignos asserted that Mrs. Grekis ran the business and was there on a daily basis, primarily at lunch hours, and was responsible for ordering supplies and for other business matters. Lignos stated that he told the police otherwise because he was "scared." Lignos testified that appellant was not around the Quick Stop very often because of other business commitments. Finally, Lignos stated that he "guessed" that appellant shared in the illegal profits from the video poker machines on the premises but denied that appellant received any share of the cigarette proceeds.

Detective Balobeck, also of the burglary squad, confirmed that he saw appellant "quite frequently" at the Quick Stop restaurant during the time period in question. He also attested to conversations he had with appellant in which appellant acknowledged that the Quick Stop was "his business." Notably, Balobeck recalled a conversation which followed the arrests in the instant case in which appellant told Balobeck that he had fired George Lignos. Balobeck also saw appellant's appearance on the evening news program during which appellant made it clear that the Quick Stop belonged to him.

Appellant testified on his own behalf. He denied having any knowledge of the cigarette fencing operation at the

Quick Stop. Appellant claimed to have no interest in the Quick Stop and stated that the restaurant was run entirely by his wife, who was a 49% stockholder, and his brother-in-law Lignos, who was a 51% stockholder. He testified that during the six month period at issue here, he was out-of-town the majority of time promoting concerts for a Greek entertainer. As a result he maintained that he was never present at the Quick Stop. Appellant stated that before 1985 he was the majority stockholder in the Quick Stop but in that year he transferred his entire interest to his brother-in-law George Lignos gratuitously. According to appellant, after Lignos was arrested in this case, he was fired by Mrs. Grekis even though she was the minority shareholder because it was "a family situation." Appellant further explained that the poker machines were present in the establishment through an "agreement between [appellant] and Duffy Vending Company." Later in his testimony appellant claimed that the license referred to above by Detective Parsons which listed the "location" as the Quick Stop and appellant as "owner" was really referring to the owner of the machines and not the owner of the restaurant.

The jury returned a verdict of guilty on all counts of receiving stolen property and criminal conspiracy. The gravamen of appellant's complaint on appeal goes to the sufficiency of the evidence. Appellant contends that the Commonwealth failed to carry its burden and prove beyond a reasonable doubt that he had "received" the stolen cigarettes that Neuring delivered to the Quick Stop. Further, appellant claims that it was not shown that he had the requisite knowledge of the stolen property to support conviction. He also argues that the evidence was insufficient to sustain the conspiracy convictions in that the Commonwealth failed to show a conspiratorial agreement between the parties. Moreover, appellant contends that he could not be convicted of nineteen separate counts of receiving stolen property because the Commonwealth failed to prove the elements of each distinct charge. Similarly, he argues that the conspiracy was a continuous one, if it existed at all, and

that it was also error to charge and convict on nineteen separate counts of conspiracy. The trial court compounded the error, according to appellant, by sentencing him to consecutive sentences on fourteen of the receiving stolen property counts. We agree with appellant on one asserted claim, i.e., that it was error to charge and convict him on 19 counts of criminal conspiracy and that only one continuing conspiratorial agreement is reasonably established by the evidence. In all other respects, we affirm the judgment of sentence.[7]

██ We begin with the familiar and well established admonition that our standard of review for challenges to the sufficiency of evidence is limited. We must determine whether, viewing all the evidence at trial, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense was proven beyond a reasonable doubt. Both direct and circumstantial evidence receive equal weight when assessing the sufficiency of the evidence. *Commonwealth v. Carson*, 405 Pa.Super. 492, 592 A.2d 1318, 1320 (1991); *Commonwealth v. French*, 396 Pa.Super. 436, 578 A.2d 1292 (1990). All

---

7. Appellant also challenges one evidentiary ruling by the trial court. He asserts that the trial court erred in admitting into evidence the prior inconsistent statement by Neuring to Detective Parsons that Neuring had spoken to appellant on a single occasion regarding the potential purchase of the cigarettes, a conversation Neuring denied at trial. This argument is without merit. The law is now abundantly clear that prior inconsistent statements of a non-party witness are admissible at trial as substantive evidence as well as for impeachment purposes. *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986). To be admissible for such purposes, "the declarant must be a witness in a judicial proceeding, and the declarant [must be] available for cross-examination." *Commonwealth v. Sopota*, 403 Pa.Super. 1, 10, 587 A.2d 805, 809 (1991). As declarant, Neuring certainly satisfied these requirements. The only other requirement regarding the admissibility of Neuring's out-of-court statement is that it have been given under circumstances which render it sufficiently reliable. *Commonwealth v. Patterson*, 392 Pa.Super. 331, 572 A.2d 1258 (1990). Appellant does not suggest, nor does the record reveal, any reason to challenge the reliability of Neuring's voluntary statements to Detective Parsons. The trial court did not err in permitting the use of the statement as substantive evidence.

reasonable inferences, consistent with the evidence, must be viewed in the Commonwealth's favor as verdict winner.

In order to convict appellant of receiving stolen property, it was necessary for the Commonwealth to show three elements beyond a reasonable doubt. The evidence must establish that the property was stolen, that appellant was in receipt, possession or control of it, and that appellant had "guilty knowledge", that is, that he knew or had reason to know that the property was stolen. *See Commonwealth v. Carson*, 405 Pa.Super. at 496, 592 A.2d at 1321; *Commonwealth v. Stasiak*, 305 Pa.Super. 257, 265, 451 A.2d 520, 524 (1982).

The Commonwealth clearly proved that the cigarettes were stolen. Appellant does not dispute this element. He claims, instead, that on the element of receipt or possession and on the element of appellant's knowledge the Commonwealth's proof was inadequate. Appellant maintains that since the evidence was uncontroverted that Neuring sold the stolen cigarettes to Lignos and Mavroides only and that appellant never directly purchased the goods from the thief, the evidence therefore fails to establish appellant's knowledge or possession of the contraband. The Commonwealth counters by arguing that its case was premised upon the concept of constructive possession which it sufficiently established through an abundance of circumstantial evidence. If the Commonwealth can show that appellant had constructive possession of the stolen goods, it is clear that the element of receiving or possessing the stolen property is satisfied. *Commonwealth v. Brady*, 385 Pa.Super. 279, 287, 560 A.2d 802, 806 (1989).

The legal concept of constructive possession is a well-settled and flexible one in the criminal law. In theory, our Supreme Court has defined it as follows:

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband

was more likely than not. We have defined constructive possession as "conscious dominion."... We subsequently defined "conscious dominion" as "the power to control the contraband and the intent to exercise that control."

*Commonwealth v. Mudrick,* 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986) (citations omitted).

 In *Mudrick* and elsewhere, our courts have cautioned that the doctrine of constructive possession defies bright line application. *Commonwealth v. Mudrick,* 510 Pa. at 308, 507 A.2d at 1213; *Commonwealth v. Carroll,* 510 Pa. 299, 302, 507 A.2d 819, 821 (1986); *Commonwealth v. Stembridge,* 397 Pa.Super. 1, 7, 579 A.2d 901, 904 (1990). Instead, we must examine the totality of the circumstances in order to assess whether constructive possession has been shown. Moreover, it is clear that circumstantial evidence alone can be used to show the requisite circumstances. *Commonwealth v. Macolino,* 503 Pa. 201, 206, 469 A.2d 132, 134 (1983).

In our judgment, the Commonwealth's evidence and all the reasonable inferences which arise therefrom, sufficiently established that appellant had "conscious dominion" over the illegal property at the Quick Stop restaurant. The jury reasonably could conclude that the Quick Stop was a business which was de facto owned, operated and controlled by Angelo Grekis. Detectives Parsons and Balobeck both unequivocally testified that their duties required them to patrol the Quick Stop frequently and regularly. On numerous occasions, during the applicable time period, appellant was seen by the detectives both inside the store and in front of it. This testimony contradicted both appellant's trial testimony and that of Lignos. The jury, however, was free to believe the detectives. The detectives also attested to repeated conversations with appellant in which he admitted control and management of the Quick Stop and confirmed that it was "his establishment." The jury was entitled to reject as implausible, incredible or self-serving, appellant's protestations that he transferred control of the business to

his brother-in-law and that he himself had no role in running the restaurant.

The substance of the detectives' conversations and observations was corroborated by numerous circumstances from which dominion and control by appellant could also be inferred. Among· these circumstances is the fact that George Lignos was fired after this incident even though according to appellant, Lignos was the majority shareholder. Additionally, Lignos himself told the police in a recorded statement following his arrest that appellant was the proprietor of the Quick Stop while Lignos was merely the night manager. Lignos confirmed the accuracy of this statement during direct examination but recanted during cross. Further, the police seized an electronic device license from the Quick Stop which listed appellant as "owner" at that location. The jury was not bound to accept appellant's explanation that the license was referring to the owner of the video machines if such an interpretation did not conform to experience or common sense.

Based on the combination of this evidence and the reasonable inferences which must be drawn from it in favor of the Commonwealth, we conclude that the jury certainly could infer that appellant in fact controlled the operation of the Quick Stop restaurant. As owner and operator, appellant could reasonably be found to exercise dominion and control over a continuous and voluminous flow of stolen cigarettes which were openly stored in and sold from his restaurant on a daily basis during a six month period, particularly since he was seen there on a frequent basis by the detectives. *See Commonwealth v. Walters,* 250 Pa.Super. 446, 378 A.2d 1232 (1977) (jury could have inferred that the defendant had the power to control the stolen goods from the fact that he had a proprietary interest in the trailer where the goods were found and from his presence in the trailer at various times when the goods were there). We note that there is no requirement that appellant actually physically have handled the stolen goods in order to have possessed them for purposes of this offense. Moreover,

appellant's dominion and control over the goods may be exercised through another, *e.g.,* in this case through his admitted "employees", Lignos and Mavroides. It is clear that appellant attempted to insulate and isolate himself from the fencing operation. The jury did not find appellant's position to be credible.

The appellant also argues that the Commonwealth failed to prove guilty knowledge. We disagree. Given the conclusion that appellant actually ran and controlled Quick Stop's business we find that it was reasonable for the trier of fact to conclude, based on inferences drawn from the evidence, that appellant knew both of the presence of the stolen cigarettes and that they were stolen. The testimony at trial demonstrated that Neuring supplied the Quick Stop with literally hundreds of cartons of cigarettes a week which eventually were stacked in the restaurant behind the register where the sales took place. Anyone in the restaurant, much less the owner, would be aware of the presence of such a mass of valuable goods. Moreover, the existence of the cigarettes could not be accounted for through legitimate channels and a person connected, as appellant was, with the operation of the business could be assumed to know this. Evidence produced from the records of the business established that legitimate purchase of cigarettes for resale in the store never amounted to more than a tiny fraction of the large quantities displayed and available for sale at the Quick Stop. Moreover, anyone involved in the purchase and sale of cigarettes would be familiar with the tax stamp that each pack carries. The evidence at trial established that 65 different tax stamps were represented in the quantity of goods seized by the police, even though the Quick Stop's business records indicated that only two distributors sold to the store through legal channels.

In addition, the illegal purchase of the cigarettes from Neuring involved a steady and sizable outflow of cash from the store's cash register, late at night, two or three times a week. Further, the sale of the cigarettes produced thousands of dollars worth of profit for the business while

Neuring was supplying the Quick Stop. Assuming, as we must, that the evidence fairly supported the inference that appellant operated and controlled the Quick Stop, we conclude that the trier of fact could believe that appellant knew that the cigarettes were there and that they were stolen merchandise. We reiterate that knowledge that goods are stolen may be established entirely by circumstantial evidence. *Commonwealth v. Carson,* supra, 405 Pa.Super. at 497, 592 A.2d at 1321; *Commonwealth v. Pinkston,* 342 Pa.Super. 333, 341, 492 A.2d 1146, 1150 (1985).[8] We conclude the Commonwealth proved appellant's guilty knowledge beyond a reasonable doubt.

■ Appellant also contends that the evidence of conspiracy was insufficient because the Commonwealth failed to prove the existence of a conspiratorial agreement. Appellant correctly notes that it is essential for such an agreement to exist before a conspiracy conviction can be upheld. *See, e.g., Commonwealth v. French,* 396 Pa.Super. 436, 440, 578 A.2d 1292, 1294 (1990). In this regard, this court recently has stated:

It is equally plain that direct proof of such an agreement is rarely available, nor is it necessary. Thus, 'proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities'.... An agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coa-

8. Appellant's related argument that it was error to charge him with nineteen counts of receiving stolen property is premised entirely on his assertion that appellant "was never shown to be in possession of any of the stolen cigarettes" because he was out of town the majority of the time. Our discussion regarding the sufficiency of the evidence disposes of this claim. Moreover, it is clear that the Commonwealth demonstrated at trial that Neuring delivered the fruits of each of nineteen admitted burglaries to the Quick Stop immediately after each was perpetrated. Each receipt could, as discussed above, be constructively imputed to appellant as the individual in charge of the Quick Stop and frequently present.

lesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

*Id.,* 396 Pa.Super. at 440–441, 578 A.2d at 1294 (citations omitted).

Here appellant argues that, in addition to there being no evidence of an explicit agreement between himself and Neuring for the receipt of stolen goods, there is also no persuasive circumstantial evidence to show an implicit agreement between himself, Lignos, Mavroides and Neuring to receive stolen property. We reject this argument. The reasonable inferences consistent with the evidence permit the conclusion, explained at length above, that appellant was the de facto owner and operator of the Quick Stop and that Lignos and Mavroides were his employees. The funds used to purchase the stolen goods were regularly taken from the cash register at appellant's restaurant. The stolen goods were sold from and stored in open view at the Quick Stop. Not only was George Lignos appellant's employee and brother-in-law, but he was also a next door neighbor. The family relationship was close and strong enough for appellant to sign over his majority share in the stock of Quick Stop for no consideration. Moreover, appellant's customary presence in the restaurant, the volume and value of the stolen cigarettes, the frequency of the deliveries and the substantial profit at which the goods were sold, are factors which contribute to the conclusion that appellant knew of the crime and participated in it. Moreover, it is wholly unnecessary to prove that appellant knew the identity of Neuring or directly conspired with Neuring in order to establish an agreement amounting to a criminal conspiracy. Based on 18 Pa.C.S.A. § 903(b), this court has pointed out that, "it is not necessary that each conspirator know the identity of each fellow conspirator so long as the conspirator knows that a person with whom he has conspired has in turn conspired with other unknown persons to aid in the attainment of their joint conspiratorial objective(s)." *Commonwealth v. Savage,* 388 Pa.Super. 561, 572, 566 A.2d 272, 277 (1989).

In fact, in the main appellant's argument regarding the sufficiency of the evidence on conspiracy is premised on insisting that the evidence at trial failed to show that he was present at the Quick Stop, operated the Quick Stop or knew about the stolen merchandise. However, as our earlier discussion makes plain, we conclude that there was ample evidence to demonstrate all three of these allegedly missing factors. We find that the circumstances surrounding the conspiracy justify the conclusion that the parties here had agreed to act in concert to commit the offense of receiving stolen property.

More troublesome, however, is appellant's assertion that the Commonwealth did not prove nineteen conspiracies but a single, continuing conspiracy which included, inter alia, nineteen deliveries of stolen merchandise. In this matter, we conclude that appellant must prevail. Given the nature of the evidence here, we agree that it proved a single, ongoing and continuous conspiracy rather than a distinct criminal agreement each time Neuring delivered the cigarettes. Recently, this court has explained:

> Under Pennsylvania law, a single conspiracy may have multiple criminal objectives.... Thus, when on a single occasion there is a single agreement to commit two crimes, e.g. murder and arson, a single conspiracy exists.... Likewise, a single conspiratorial agreement may involve a continuing course of criminal conduct involving the repetition of a single crime or the commission of a series of crimes.

*Commonwealth v. Savage*, 388 Pa.Super. 561, 571, 566 A.2d 272, 276–277 (1989); *see also Commonwealth v. Troop*, 391 Pa.Super. 613, 621, 571 A.2d 1084, 1088–89 (1990) (where the evidence demonstrated that the co-conspirators formulated a distinct and separate criminal plan and committed a robbery each time their need for money for cocaine arose, evidence warranted a finding of three separate conspiracies).

In light of this standard, we find that the evidence here substantiates only a single conspiracy to accomplish sever-

al, repeated crimes. By so concluding we do not fail to appreciate that this conspiracy involved numerous serious offenses. No doubt the "fencing" arrangement with the Quick Stop facilitated and encouraged the many separate burglaries committed by Neuring. Nonetheless, the heart of the offense of conspiracy is the agreement and in our view the evidence at trial reasonably supports the inference of only one. *See Commonwealth v. Perez*, 381 Pa.Super. 149, 553 A.2d 79, *appeal dismissed*, 525 Pa. 132, 577 A.2d 1340 (1989). Thus, we vacate the convictions on all but one count of criminal conspiracy. Since no penalty was imposed by the trial court on any conspiracy count, however, no further relief with respect to this error is warranted.

■ In a related claim of error, appellant asserts that the trial court erred in sentencing him consecutively on several counts of receiving stolen property. His challenge is two-fold. First he argues that the evidence was insufficient to convict, a claim which has been exhaustively disposed of above. Second, appellant argues that since the Commonwealth proved only an "ongoing and continuous scheme," he should have been sentenced on only one count of receiving stolen property. We reject this approach.

While, we agree, as previously discussed, that only one conspiratorial agreement can be inferred from the evidence, the crime of receiving stolen property was committed each time appellant took conscious dominion over and had knowledge of each delivery of stolen merchandise. The testimony at trial established that Neuring delivered the stolen cigarettes directly to the Quick Stop almost immediately upon completion of each burglary. Appellant has cited us to no cases, nor have we found any, which even suggest that a separate sentence cannot be imposed for each offense committed. In fact, it is clear that even consecutive sentences such as those imposed here have been sanctioned by this court in analogous circumstances. *See Commonwealth v. Yacoubian*, 339 Pa.Super. 413, 489 A.2d 228 (1985) (ringleader of burglary/fencing operation sentenced to seven consecutive sentences on each of seven convictions for

receiving stolen property); *Commonwealth v. Donnelly,* 233 Pa.Super. 396, 336 A.2d 632 (1975) *cert. denied,* 424 U.S. 974, 96 S.Ct. 1477, 47 L.Ed.2d 744 (1976) (where the record fairly indicated two separate thefts and deliveries of sets of bonds, the trial court did not err in, imposing sentence on each conviction of receiving stolen goods). We conclude that the trial court did not abuse its broad discretion in imposing consecutive sentences here.

Therefore, in accordance with the above findings, we vacate appellant's conviction on all except one conspiracy charge and we affirm the judgment of sentence on appellant's convictions for receiving stolen property.