615 A.2d 398

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Maria AVILES, Appellant.**

Superior Court of Pennsylvania.

Argued June 1, 1992.

Filed Oct. 22, 1992.

Peter C. Bowers, Philadelphia, for appellant.

George S. Leone, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before ROWLEY, President Judge, and WIEAND, CIRILLO, OLSZEWSKI, MONTEMURO, POPOVICH, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

POPOVICH, Judge:

This case has been granted *en banc* consideration to assess a challenge to the judgment of sentence imposed following a bench trial and conviction for various drug offenses. We affirm.

The sole issue concerns the sufficiency of the evidence to sustain Maria Aviles' convictions. To assess such a claim, one looks to a time-honored test oft-stated in this jurisdiction; to-wit:

> ... in determining if the evidence was sufficient to sustain the conviction, the test is, whether accepting as true all of the evidence (be it direct or circumstantial) and all reasonable inferences arising therefrom, upon which the jury, or the trial court in a nonjury trial, could properly have reached its verdict, is it sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime of which [s/]he has been convicted.

*Commonwealth v. Wrona,* 442 Pa. 201, 204, 275 A.2d 78, 79–80 (1971). Accord *Commonwealth v. Macolino,* 503 Pa. 201, 469 A.2d 132 (1983); *Commonwealth v. Thornton,* 494 Pa. 164, 430 A.2d 1168 (1981); *Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179 (1980); *Commonwealth v. Helm,* 485 Pa. 315, 402 A.2d 500 (1979); *Commonwealth v. Williams,* 447 Pa. 206, 290 A.2d 111 (1972); *Commonwealth v. Kirkland,* 413 Pa. 48, 195 A.2d 338 (1963). Of course, the record in the instant appeal must be considered and read in the light most favorable to the Commonwealth. E.g., *Commonwealth v. Rankin,* 441 Pa. 401, 272 A.2d 886 (1971).

So viewed, the evidence reveals that at 7:30 p.m. on the 23rd of January, 1989, Police Officer Daniel McEwen, in the company of five other officers, arrived at 181 West Wishart Street, Philadelphia, to execute a search warrant obtained on the strength of a first-time informant's account of drug activity and follow-up surveillances by Officer McEwen.[1]

1. In particular, the probable cause section of the warrant provided that, between 1:30 p.m. and 2:30 p.m. on Sunday, the 22nd of January, 1989, the informant was inside the Wishart Street residence in the company of two "occupants" identified as "Zoraida" and "Flea". The two "r[a]n a cut house" in which:

> ... they obtain[ed] large amounts of Cocaine in bulk form, from drug dealers, and they then cut and package[d] these drugs into smaller packets, thus preparing the drugs for street sale, all in various amounts/weights. The Informant kn[e]w this to be true because during the aforementioned dt. and times, the Informant did observe on 2 separate occasions, unknown hispanic males enter[ ] this location and hand[ ] bulk amounts of COCAINE to the above mentioned persons, those persons then on each occassions [*sic*] telling the unknown hispanic males, "We can't cut this until tonight, you can come for it around 10:00 tomorrow night, we're backed up". During this period the Informant did observe these aforementioned persons retrieve from a gray tool box, a large square brick of compressed white powder, (COCAINE), and cut this into smaller pieces, weighing and packaging each piece individually on a kitchen table.

Because of the information received, Officer McEwen conducted a surveillance of the Wishart Street address on the following dates and times, all of which were included in the probable cause section of the warrant which read:

> On 1–22–89 at 5:25 P.M., the Affiant did conduct a surveillance from a vantage point of 181 Wishart St., and remain there until 5:50 P.M., same date. During this period, the Affiant observed on 2 separate occassions [*sic*], vehicles drive to this location and different unknown

Once at the site, Officer McEwen knocked on the front door and announced, "Police". Ms. Aviles opened the door and was informed that the police were requesting entry into the house. Consent was given. All those present were advised to remain calm and that the police had a search warrant. At this time, Ms. Aviles addressed Officer McEwen: "She said don't talk to anyone else, talk to me. This is my place."

A team of officers conducted a search of the premises. Within 10 minutes of their arrival, Officer McEwen was called to the second floor, rear bedroom and Officer Tames pointed to an open dresser drawer containing a brown metal box. The box was found to contain:

a) 54 plastic packets, each containing a white powder and sealed with gold tape;

b) 3 different sized sandwich baggies containing a white powder;

c) 7 clear plastic packets sealed with orange tape;

d) a small glass bottle containing a white powder; and

e) 3 black and green grinders and a screen, all of which contained a white residue.[2]

hispanic males did enter this location carrying small packages and left after only a few seconds without those packages.
On 1–22–89 between 8:45 P.M. and 9:10 P.M., the Affiant did again return to this location and did conduct a second surveillance of location and observed on 1 occassion [sic] an unknown hispanic male walk to the front door, knock and was let in while carrying a small package and left without this package after only a few seconds. On 1–22–89 between 11:00 P.M., the Affiant conducted a surveillance of location yielding no activity observed.
On 1–23–89 between 4:10 P.M. and 4:30 P.M., the Affiant conducted a surveillance of location and observed on 2 separate occassions [sic], unknown hispanic males drive to the front of this location and appeared to dropp [sic] ·off small items wrapped in green plastic trash type material on each occassion [sic], each only staying inside for a few seconds.
The search warrant was admitted into evidence without objection. See Trial Court Opinion at 4.

**2.** More particularly, Officer McEwen testified that he inventoried:
a) Ziplock bags containing 199 grams of chunky white powder (cocaine);
b) Clear plastic ziplock bag containing 112.1 grams of cocaine;
c) Small white bag containing 35.1 grams of cocaine;
d) 54 pink plastic packets containing white powder;

Officer Tames stated that the door to the rear bedroom was open and he "did not break any lock". With regard to the metal box, Officer Tames testified:

> ... when I got the box out of the drawer ... it was closed and I just pulled this [latch] up like that and opened it. * * * I didn't pry it open. I just opened it.

Then, Officer McEwen proceeded to the second bedroom, which was the middle bedroom on the same floor. There McEwen observed Sergeant Perez "on his hands and knees removing floor boards ... from the eastern-most wall of that room." Retrieved from under the floor was an "open toolbox" containing $10,538 in cash. McEwen also found a second box in the middle bedroom which contained:

a) 1 scale with 5 weights marked 50, 20, 20, 10 & 5 grams;

b) Electronic heat-sealer (10" × 10") with a plug;

c) 2 strainers (10" & 5" in diameter);

d) Screen;

e) Hundreds of empty, clear plastic packets; and

f) 12 rolls of gold tape.

Sergeant Perez was the first officer to enter the middle bedroom, and, in respect thereto, he stated that he *did not* have to force the door open to get in: "The door [he] went into, to get into the room, [he] didn't break."

The police found proof that Aviles resided at the stated address. Likewise, Ms. Aviles admitted being the lessee and that, for approximately 5 years prior to the search, she had rented the rear and middle bedrooms for $35 a week to supplement her receipt of $474 a month from the Department

e) 8 packets, 3 of which were field tested for cocaine; net weight: 175, 168, 119, 146, 163, 132, 85 & 142 milligrams, respectively;
f) 1 ziplock bag containing 7 sealed plastic packets of white powder—2 packets selected at random contained cocaine and weighed 197 & 270 milligrams, respectively;
g) 3 black and green plastic grinders, each with a residue of white powder (cocaine); and
h) 1 clear glass jar containing 5.97 grams of a chunky white substance which was not controlled.

of Public Welfare.[3]   She and her 3 children slept on the second floor, front bedroom next to the middle and rear bedrooms.

Ms. Aviles testified that the rear and middle bedrooms had been rented to her sister (Zoraida) and brother-in-law (nicknamed "Flea") from the beginning of December, 1988 until the police arrived.[4]   She denied having any knowledge of the drugs, the location of the drug paraphernalia or the sawed-out floor-compartment wherein the money was hidden.

It was Jorge's belief that the sawed-out floor-boards in the middle bedroom had been perpetrated by the police *during* their search since, he claimed, no such opening existed prior thereto.  This was confirmed by Aviles' sister (Gladys), who rented the same two bedrooms from 1987 until 1988 and noticed no floor boards having been sawed through and used

**3.**  Ms. Aviles testified that she rented the rowhouse in question (which is no more than 16 feet in width) for $175 a month and paid $75 for electricity;  $27 for gas;  and $100 a month for heating oil.  Her family's living expenses came to $375, an amount which had to be offset by the receipt of $237 every two weeks from the Department of Public Welfare and the rent ($35) for the 2 bedrooms.

**4.**  Interestingly, on February 1, 1989, Aviles' counsel had photographs taken of the premises.  All were of the rooms searched by the police on January 23, 1989, and depicted the disheveled condition in which the bedrooms and hallway were left, allegedly, by the police:  clothing thrown willy-nilly and the second floor hallway was littered with clothing and other debris.  All of this, supposedly, remained intact for 10 days *after* the search *and following*, according to Aviles' son (Jorge), "Zoraida and Flea's" flight from the premises on the evening following the police's search—"They picked up the children and they picked up their clothes and they left ... and [Jorge] ha[s]n't seen them no more." Yet, those same two bedrooms still appeared to be cluttered with clothing and other personal belongings of Zoraida and "Flea" well after they exited the premises on the heels of the police search.

Further, neither Ms. Aviles nor any of her witnesses (son and sister, Gladys) knew the number of children in Zoraida's family (Jorge said: 5; Ms. Aviles said: 4).  And, during the entire time that Zoraida, "Flea" and the children lived in Aviles' home, Gladys indicated that *no one told her* Zoraida was in town.

Also, it needs to be mentioned that a private detective was hired by Aviles' counsel to take photographs of the condition of the bedrooms *after* the search.  However, no effort was made to produce "Zoraida". All that was achieved was a "stipulation" by counsel that the defense attorney had spoken to a "Zoraida".  This was done, purportedly, to establish that Maria Aviles and "Zoraida" were not one and the same person.

as a storage area. On the other hand, the police testified to the contrary: McEwen "didn't observe any sawdust or fresh type markings [in the floor boards]. They appeared to be well worn[, i.e., he] wouldn't say it was recently cut."

Lastly, Aviles testified that locks were placed on the doors to the rear and middle bedrooms by her sister immediately upon renting the rooms; she denied having any keys to the locks; she denied selling drugs; and she did not know about the metal boxes or the hole in the floor in the middle bedroom or its contents. The trial court, after hearing from both sides, found Ms. Aviles guilty as charged and revoked her bail.[5]

Post-trial motions were filed, denied and sentence was imposed. On an initial appeal to this Court, a panel majority (with Cavanaugh, J. dissenting) reversed the judgment of sentence and discharged Ms. Aviles. However, on petition of the Commonwealth, this Court granted *en banc* certification to determine whether the Commonwealth established, beyond a reasonable doubt, Aviles' guilt for knowingly or intentionally possessing a controlled substance, possession with intent to manufacture or deliver a controlled substance and possession of drug paraphernalia. See 35 P.S. § 780–113(a)(16), (30) & (32) (Supp.1992).

The standard of review having been articulated earlier, it will not be repeated here, except we add to the appellate-review-equation the reliance upon "constructive possession" as a vehicle by which to prove Ms. Aviles' knowing or intentional possession of cocaine and drug paraphernalia. *Commonwealth v. Mudrick*, 510 Pa. 305, 507 A.2d 1212 (1986). Since the cocaine and drug paraphernalia were not found on Ms. Aviles' person, she was properly convicted only if the Commonwealth proved joint constructive possession. See *Commonwealth v. Griffin*, 230 Pa.Super. 425, 326 A.2d 554 (1974).

Our Supreme Court has stated on this subject that:

Constructive possession is a *legal fiction*, a pragmatic construct to *deal with the realities of criminal law enforce-*

---

5. Thereafter, bail was reinstated in the amount of $100,000.00 pending appeal. A property bond was posted by friends of Ms. Aviles.

*ment.* Constructive possession is an *inference arising from a set of facts that possession of the contraband was more likely than not.* We have defined constructive possession as "conscious dominion." *Commonwealth v. Davis,* 444 Pa. 11, 115, 280 A.2d 119, 121 (1971). We subsequently defined "conscious dominion" as "the power to exercise that control." *Commonwealth v. Macolino,* 503 Pa. 201, 206, 469 A.2d 132, 134 (1983). Though these tests may be helpful and logical in the abstract, application to actual factual situations, particularly when multiple actors are involved, has proven difficult for our ... courts in cases involving controlled substances located on premises in joint possession but not on the actual person of any of the parties entitled to occupy those premises.

To aid application, we have held that *constructive possession may be established by the totality of the circumstances. Commonwealth v. Fortune,* 456 Pa. 365, 318 A.2d 327 (1974). We took a further step toward resolving these problems in *Commonwealth v. Macolino, supra.* In *Macolino,* contraband and otherwise legal items used in the drug trade were found in the common bedroom of the Macolinos, a married couple. We held that "constructive possession can be found in one defendant when both the husband and wife have equal access to an area where the illegal substance or contraband is found." 503 Pa. at 208, 469 A.2d at 135. *See also Commonwealth v. Carroll,* [510] Pa. [299], 507 A.2d 819 (1986).

... *We hold today that* even absent a marital relationship *constructive possession may be found in either of both actors if contraband is found in an area of joint control and equal access.* * * * [In] the *Macolino* analysis[,] *shared access to and control of the area where the contraband was found was critical.*

*Mudrick,* supra, 510 Pa. at 308–09, 507 A.2d at 1213–14 (Emphasis added). Accord *Commonwealth v. Grekis,* 411 Pa.Super. 494, 601 A.2d 1275 (1992); *Commonwealth v. Parsons,* 391 Pa.Super. 273, 570 A.2d 1328 (1990); *Commonwealth*

*v. Santiesteban,* 381 Pa.Super. 18, 552 A.2d 1072 (1988); *Commonwealth v. Davis,* 331 Pa.Super. 285, 480 A.2d 1035 (1984).

■ The trial court concluded, in denying post-trial motions, that "Maria Aviles was the lessee at the subject premises and she had access to all the bedrooms, none of which were locked." Trial Court Opinion at 3. The evidence is consistent with such conclusions. Specifically, Ms. Aviles *admitted* that she was the lessee at 812 West Wishart, that she had subleased 2 of the 3 upstairs bedrooms for the past 5 years for a fixed dollar amount, and that the most recent sub-lessees were her sister and brother-in-law.

The trial court also concluded that Ms. Aviles had "access to all the bedrooms". In none of the testimony reviewed by this Court was there a reference by either Ms. Aviles or her witnesses that she was *denied* access to the rear and middle bedrooms. Albeit Ms. Aviles stated that her sister and brother-in-law affixed "locks" to the rented bedrooms, and Aviles' son testified that there were "locks" on the two rooms thereafter, the account of the officers was to the contrary.[6] This created a disputed issue of fact.

Since the trial court, as the trier-of-fact, had the prerogative to believe all, some or none of the testimony proffered, the verdict rendered in this case reflects the trial court's acceptance of the officers' version of the physical condition of the residence and the 2 bedrooms housing Zoraida, "Flea" and their children. Accordingly, such determinations, being buttressed by the record, we are not at liberty to usurp the trial court's roles as credibility-assesser and arbiter-of-fact or substitute our (different) conclusions on matters within its bailiwick. Contrast *Helms,* supra.

Continuing, the principles enunciated in *Mudrick,* supra, are equally applicable to aid us in determining whether joint constructive possession (power to control and intent to control) has been proven by the Commonwealth.

6. Sergeant Perez and Officer Tames repeatedly denied having used force to enter the rear and middle bedrooms; each testified that the doors were open upon their arrival and contained no locks.

Initially, we set forth some guideposts to assist us in our endeavor. First, in constructive possession cases involving drugs, all facts and circumstances surrounding the possession of drugs are relevant in determining whether contraband was possessed with the requisite intent to deliver or manufacture. See *Davis,* supra. Second, in conjunction with the quantity of drugs possessed, the courts have considered the presence of paraphernalia used in the narcotics trade as well as the presence of inordinately large sums of cash in ferreting out the element of intent. See *Helms,* supra, citing *Commonwealth v. Fisher,* 316 Pa.Super. 311, 462 A.2d 1366 (1983); *Commonwealth v. Bundridge,* 303 Pa.Super. 267, 449 A.2d 681 (1982); *Commonwealth v. Smith,* 250 Pa.Super. 460, 378 A.2d 1239 (1977). Finally, albeit not dispositive, a defendant's presence at the location where drugs are discovered is a factor in establishing knowledge that contraband is present and his/her exercise of dominion and control over the same. See *Parsons,* supra, citing *Commonwealth v. Harris,* 263 Pa.Super. 110, 397 A.2d 424 (1979).

In evaluating proof of joint constructive possession, one must be cognizant of the "realities" of criminal law enforcement and the "totality of circumstances" before one may be allowed to "infer" from a set of facts that possession of contraband "was more likely than not" properly assignable to a defendant.

Instantly, viewing the evidence in a light most favorable to the verdict-winner, we find it reasonable to conclude that Ms. Aviles was the lessee of the premises in which a large amount of cash, drugs and drug paraphernalia were found; the day preceding the search, an informant had witnessed the receipt of large quantities of cocaine from drug dealers on two separate occasions at Aviles' residence; on the same day, the informant heard Aviles' sister and brother-in-law advise suppliers that processing the drugs would not be complete until the *following day* because they were "backed up"; the informant witnessed a brick of cocaine being cut, weighed and individually packaged "on [the] kitchen table"; no more than an hour-and-a-half after the informant's viewing and communi-

cation of the same to the police, a surveillance of the premises disclosed 3 occasions in which unknown Hispanic males walked into the premises in question with small packages and exited within a "few seconds without those packages"; a surveillance of the premises 3 hours prior to the warranted search produced 2 additional observations of similar activity as that which transpired the day before; Ms. Aviles was on the premises when the search was conducted; and, the 2 second-floor bedrooms in which money, drugs and drug paraphernalia were found were situated next to Ms. Aviles' sleeping quarters and were accessible to anyone wishing to enter while in the residence.

From the evidence presented to the factfinder, when viewed under the totality of the circumstances and drawing all reasonable inferences therefrom bounded only by the "realities" of drug activity and its attendant variables, we find that Ms. Aviles had joint control over and equal access to areas where cocaine, drug paraphernalia and money were found—the rear and middle bedrooms.

The factfinder could properly find that Ms. Aviles and her sub-lessees not only had control and access to all the bedrooms *but the whole residence.* Thus, analyzing all the circumstances, the trial court could infer Ms. Aviles' constructive possession of the cocaine, drug paraphernalia and money which were openly accessible to her in the rear and middle bedrooms.

We find the evidence, and the *reasonable* inferences to be drawn therefrom, to be supportive of the verdicts. Therefore, we affirm the judgment of sentence issued by the Philadelphia County Court of Common Pleas.

WIEAND, J., files a dissenting Opinion in which President Judge ROWLEY, and MONTEMURO and FORD ELLIOTT, JJ., join.

WIEAND, Justice, dissenting:

A majority of this Court, by its holding in this case, has made it possible to convict parents and rooming house owners

of possession of controlled substances which have been concealed by a child or roomer in his or her bedroom even though the parent or owner has no knowledge of the presence of the controlled substance. I dissent. The doctrine of constructive possession should not be expanded to make possible the conviction of persons who merely happen to be living in the same residence where drugs are found.

On January 23, 1989, police obtained a warrant to search a two story row house located at 181 West Wishart Street, Philadelphia. The warrant was issued upon information obtained from a confidential informant that drug related activities were being conducted at that address by persons named "Zoraida" and "Flea." The affidavit recited also that police, on five separate occasions, had observed the delivery of small packages to the Wishart Street home by unidentified, Hispanic males. When police arrived to execute the warrant, they were admitted by appellant, who told police that the house was hers. Also present at the time of the search, according to police testimony, were a Hispanic male in his mid-twenties, an elderly Hispanic male, a juvenile Hispanic male approximately seventeen years of age and several small children. During the search, police found in the rear bedroom on the second floor a metal box containing a large quantity of cocaine and items of drug paraphernalia. This box was found in a dresser drawer which also contained children's clothing. In the middle bedroom on the second floor, police discovered a tool box containing more than ten thousand ($10,000.00) dollars in cash. The box had been hidden under loose floorboards. Also found in the middle bedroom was a second tool box containing numerous items of drug paraphernalia.

The uncontradicted testimony was that the middle and rear bedrooms had been sublet by appellant to her sister and brother-in-law, who were the persons named "Zoraida" and "Flea" in the affidavit for the search warrant. The testimony was that "Zoraida" and "Flea" had been renting these two bedrooms from appellant continuously after December, 1988, and had occupied the same with their children. The trial court expressly accepted this testimony and found as a fact

that the two rooms had been occupied by appellant's sister and brother-in-law.[1]

Despite these facts, the trial court found appellant guilty. It did so, as it stated in its opinion, because appellant was the primary tenant, because she was present at the time of the search, because the rooms in which the drugs were found were unlocked and because the persons suspected of drug activities were her relatives. The trial court's reasoning, more specifically, was as follows:

In the non-jury trial of Maria Aviles, this Court learned that the defendant admitted possession and control of the premises, and that she was the only resident adult present when the house was searched that evening. While the defendant herself did not sleep in either of the rooms containing the contraband, it is also true that neither of those rooms was locked on the date of the search. In addition, the persons allegedly wanted by the police for previous drug sales, Zoraida and Flea, were relatives of defendant, as well as her tenants. Evidence adduced at trial showed that suspicious drug activity was observed at the premises by police in the days immediately prior to obtaining the search warrant.

The cases cited by defendant in support of her position are all fact-specific, and thus not controlling in the case at bar. Maria Aviles was the lessee at the subject premises and she had access to all the bedrooms, none of which were locked. She permitted others to live in the house, and they happened to be her sister and brother-in-law. Ms. Aviles, therefore, must be presumed to be aware of the activities engaged in by her relatives/tenants when various males would visit the home for brief periods of time to make transactions. She must also be presumed to have known why floor boards were removed and then replaced after

---

1. There was also testimony presented by the defense that the subtenants had installed locks on the doors to the rented bedrooms. However, the testimony of the police officers, who had participated in the search, established that the middle and rear bedrooms had not been locked at the time the house was searched. The officers were unable to recall whether or not the doors to these rooms had been equipped with locks.

large sums of cash were hidden under the floor of the middle bedroom, right next to that of the defendant.

My own review of the record discloses no evidence whatsoever that the drugs found in the two subleased bedrooms belonged to appellant or even that she was aware of their presence. The drugs were not found in the living room or any other common area of the house, nor was there evidence to establish that appellant slept in, stored property in, or otherwise shared access to the two bedrooms in which the contraband was found. On the contrary, the uncontradicted testimony was that the two bedrooms in which the drugs, money and paraphernalia were found had been occupied by appellant's sister and brother-in-law. The contraband, moreover, was not in plain view where it could have been observed by the primary tenant but was concealed in a dresser drawer and beneath a floorboard in the subtenant's quarters.

The Commonwealth argues that it did not offer evidence that the rooms containing drugs had been sublet and that the trial court, therefore, was free to reject such testimony. This argument, however, ignores the fact that the Commonwealth had the burden of proving beyond a reasonable doubt that the cocaine found by police was in the possession and control of appellant. The trial court's rejection of defense evidence would not have been a substitute for proof, and in no way would have relieved the Commonwealth from its burden of proving each and every element of the crime charged beyond a reasonable doubt. See: *Commonwealth v. Scott*, 409 Pa.Super. 313, 319, 597 A.2d 1220, 1223 (1991); *Commonwealth v. Peduzzi*, 338 Pa.Super. 551, 558, 488 A.2d 29, 33 (1985). See also: *Commonwealth v. Graham*, 528 Pa. 250, 596 A.2d 1117 (1991); *Commonwealth v. Clinton*, 391 Pa. 212, 137 A.2d 463 (1958). In any event, it is patently clear that the evidence of such subletting and occupancy was not rejected but was specifically accepted by the trial court acting as fact finder. An examination of the record discloses that the prosecution was unable to present any affirmative evidence that appellant, rather than the occupants of the bedrooms, knew of the presence of contraband and/or exercised control over the

bedrooms in which it was found.[2] Moreover, even if the uncontradicted testimony in this case were to be rejected, there is no evidence of appellant's knowledge of the presence of contraband or control of the bedrooms in which contraband was found other than that she was the primary tenant of the property.

The Commonwealth, being unable to prove actual possession of contraband by appellant, relied on the doctrine of constructive possession. "If the Commonwealth is unable to prove that a suspect had a controlled substance on [her] person, the Commonwealth may show constructive possession of illicit drugs, and such may be demonstrated by showing that a defendant had power of control over and intended to exercise such control of [the] substance." *Commonwealth v. Davis*, 331 Pa.Super. 285, 304, 480 A.2d 1035, 1045 (1984). See also: *Commonwealth v. Bruner*, 388 Pa.Super. 82, 98, 564 A.2d 1277, 1284–1285 (1989); *Commonwealth v. Harris*, 263 Pa.Super. 110, 119–120, 397 A.2d 424, 429 (1979). " 'The purpose of the constructive possession doctrine is to expand the scope of possession statutes to encompass those cases where actual possession at the time of arrest cannot be shown but where the inference that there has been actual possession is strong.' " *Commonwealth v. Carroll*, 510 Pa. 299, 302, 507 A.2d 819, 820 (1986), quoting Whitebread and Stevens, *To Have and To Have Not*, 58 U.Va.L.Rev. 751, 755 (1972). See also: *Commonwealth v. Stembridge*, 397 Pa.Super. 1, 4, 579 A.2d 901, 903 (1990).

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion." *Commonwealth v. Davis*, 444 Pa. 11, 15, 280 A.2d 119, 121 (1971). We subsequently defined "conscious

**2.** There was no evidence at trial that Zoraida or Flea had advised suppliers about the time when processing would be complete or that a brick of cocaine had been cut by "the aforementioned persons ... on a kitchen table." The only references to these incidents were attributed to the unnamed informant in the affidavit for search warrant.

dominion" as "the power to control the contraband and the intent to exercise that control." *Commonwealth v. Macolino,* 503 Pa. 201, 206, 469 A.2d 132, 134 (1983). Though these tests may be helpful and logical in the abstract, application to actual factual situations, particularly when multiple actors are involved, has proven difficult for our lower courts in cases involving controlled substances located on premises in joint possession but not on the actual person of any of the parties entitled to occupy those premises. *Commonwealth v. Mudrick,* 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986). See also: *Commonwealth v. Santiesteban,* 381 Pa.Super. 18, 21–22, 552 A.2d 1072, 1074 (1988); *Commonwealth v. Cruz Ortega,* 372 Pa.Super. 389, 392–393, 539 A.2d 849, 851 (1988).

Constructive possession may in some instances be inferred from the totality of the circumstances. *Commonwealth v. Fortune,* 456 Pa. 365, 369, 318 A.2d 327, 329 (1974). See also: *Commonwealth v. Macolino,* 503 Pa. 201, 206, 469 A.2d 132, 134 (1983); *Commonwealth v. Parsons,* 391 Pa.Super. 273, 284, 570 A.2d 1328, 1334 (1990); *Commonwealth v. Keefer,* 338 Pa.Super. 184, 189, 487 A.2d 915, 918 (1985). "An accused may be charged with the knowledge of the location of the contraband, which is essential to the proof of an intent to exercise control, if the contraband is found in places peculiarly within the control of the accused." *Commonwealth v. DeCampli,* 243 Pa.Super. 69, 75, 364 A.2d 454, 456–457 (1976). See also: *Commonwealth v. Stamps,* 493 Pa. 530, 538–539, 427 A.2d 141, 145 (1981); *Commonwealth v. Diaz,* 319 Pa.Super. 538, 539–540, 466 A.2d 674, 675 (1983); *Commonwealth v. Thompson,* 286 Pa.Super. 31, 34–35, 428 A.2d 223, 224 (1981). However, "where others have equal access to contraband, evidence of defendant's mere opportunity to control the contraband is insufficient to sustain a conviction [for] its possession." *Commonwealth v. Banahasky,* 250 Pa.Super. 495, 499, 378 A.2d 1257, 1259 (1977). See also: *Commonwealth v. Keblitis,* 500 Pa. 321, 324, 456 A.2d 149, 151 (1983); *Commonwealth v. Chenet,* 473 Pa. 181, 184–185, 373 A.2d 1107, 1108–1109 (1977); *Commonwealth v. Fortune, supra,* 456 Pa. at

368–369, 318 A.2d at 328–329; *Commonwealth v. Davis,* 444 Pa. 11, 16, 280 A.2d 119, 121 (1971); *Commonwealth v. Tirpak,* 441 Pa. 534, 272 A.2d 476 (1971). "It is well settled that facts giving rise to mere 'association', 'suspicion' or 'conjecture' will not make out a case of constructive possession." *Commonwealth v. Valette,* 531 Pa. 384, ——, 613 A.2d 548, 551 (1992). Still, where the defendant is shown to have access to the contraband, "the Commonwealth may demonstrate constructive or joint constructive possession, from the totality of the circumstances, even though others may have had access to the drugs." *Commonwealth v. Davis, supra,* 331 Pa.Super. at 305, 480 A.2d at 1045 (emphasis deleted). Thus, in situations where more than one person has access to the contraband, the Supreme Court has held that "constructive possession may be found in either or both actors if contraband is found in an area of joint control and equal access." *Commonwealth v. Mudrick, supra,* 510 Pa. at 309, 507 A.2d at 1214. In such cases, it is the "shared access to and control of the area where the contraband [is] found" which is critical to a finding of constructive possession. *Id.*

Under the circumstances of the instant case, I would hold that the Commonwealth failed to present sufficient evidence to establish beyond a reasonable doubt that appellant had joint control of and equal access to the drugs, cash and paraphernalia found in the two bedrooms occupied by Zoraida and Flea. A close examination of the cases interpreting the doctrine of constructive possession supports this view.

In *Commonwealth v. Macolino, supra,* the Supreme Court observed that a bedroom is a more private place with limited access and is, therefore, usually subject to the exclusive control of its occupant. *Id.,* 503 Pa. at 207, 469 A.2d at 135. See also: *Commonwealth v. Gilchrist,* 255 Pa.Super. 252, 255, 386 A.2d 603, 605 (1978); *Commonwealth v. DeCampli, supra,* 243 Pa.Super. at 74–76, 364 A.2d at 456–457. The *Macolino* Court held that a husband could be found to have been in constructive possession of drugs found in a bedroom closet which he shared with his wife. On the other hand, in *Commonwealth v. Hannan,* 229 Pa.Super. 540, 544–545, 331 A.2d 503, 505 (1974),

the Superior Court held that a husband could not be deemed in constructive possession of drugs found in his wife's purse and dresser where there was no evidence that the husband had exercised control over or had any knowledge of the presence of drugs in his wife's personal belongings. The Court in *Hannan* held further that the husband could not be deemed to be in constructive possession of marijuana which had been hidden in a drawer in the main bathroom of the house. The Court rejected the Commonwealth's position that the husband's ownership of the house and presence at the time of the search constituted sufficient evidence to permit a finding of constructive possession. The Court said:

> In this case, no drugs were found on the person of the appellant Mr. Hannan nor was there any evidence of knowledge of the presence of drugs in his home. Nine persons were present at the time of the search, all of whom were staying at the house for varying lengths of time. A nurse, renting one of the bedrooms, was home for Christmas vacation. And, just four days before the search, twenty youths had attended a Christmas party at the Hannan house. Each and every individual could have had "equal access" to the drawer in the main bathroom.... [T]he bag of marijuana was found secreted in a drawer amidst numerous items in a metal cabinet. It is sheer speculation and certainly not that quality of evidence that would be sufficient to convict beyond a reasonable doubt to presume that Mr. Hannan had either knowledge of or indeed, "possessed" the marijuana discovered by the police.

*Commonwealth v. Hannan, supra,* 229 Pa.Super. at 546–547, 331 A.2d at 506.[3]

In the instant case, there was no evidence that appellant had occupied or shared with others the two bedrooms where contraband was found. Rather, the evidence was that she had sublet those rooms to her sister and brother-in-law. To permit a finding that she had constructive possession of drugs

---

**3.** With respect to the wife, the *Hannan* Court held that she could be found to be in constructive possession of drugs found in her purse and dresser, but not of marijuana found hidden in the main bathroom.

found in these two rooms would permit homeowners to be found criminally liable whenever a person who rented a room kept cocaine or other controlled substances in the room. It would permit parents to be found in constructive possession of drugs secreted by a son or daughter in his or her bedroom. It would permit a finding of constructive possession even where a homeowner had no knowledge of the presence of drugs. To allow such a result is to allow a finding of guilt based on pure speculation. It would expand the principle of constructive possession beyond the facts of all prior decisions. Moreover, it defies the application of logic to the facts. It is not reasonable in such cases to infer knowledge of the drugs by the owner or an intent by the owner to exercise control over the contraband.

My conclusion is supported further by the decision in *Commonwealth v. Luddy*, 281 Pa.Super. 541, 547–550, 422 A.2d 601, 604–606 (1980), *cert. denied*, 454 U.S. 825, 102 S.Ct. 114, 70 L.Ed.2d 99 (1981), where evidence was held insufficient to establish that a mother had had constructive possession of marijuana found in the crisper compartment of a refrigerator. The evidence showed that she had been one of four adults living in the house and that no marijuana had been found in her bedroom or on her person. Finally, there was no evidence as to how long the marijuana had been in the refrigerator or who had put it there. A similar conclusion was reached by the Supreme Court in *Commonwealth v. Chenet, supra*. In that case, marijuana had been found in the living room and kitchen of the defendant's trailer and in the area immediately outside the trailer. In reversing the defendant's conviction for possession of the marijuana, the Supreme Court held that possession of the contraband was not established where no drugs had been found in the defendant's bedroom or on his person, but only in areas which were equally accessible to the defendant's roommate and the roommate's girlfriend. See also: *Commonwealth v. Fortune, supra*, 456 Pa. at 369, 318 A.2d at 329 ("We cannot assume that a resident of a home, where guests are present, knows of the full contents of the premises."). Compare: *Commonwealth v. Frometa*, 398 Pa.Super.

110, 580 A.2d 865 (1990) (tenant of multi-unit apartment building could not be found in constructive possession of drugs found in basement of building which was accessible to other tenants in building).

The contraband in this case was not found in portions of the residence occupied jointly by those in residence. It was found concealed in bedrooms which had been sublet by the primary tenant and which were occupied by the subtenants. The fact that the subtenants were relatives of appellant and that the bedrooms were unlocked, in my judgment, was entirely insufficient to show that the appellant had knowledge of the concealed contraband or an intent to exercise conscious dominion over it. Actual possession under the circumstances established by the evidence in this case cannot be said to be more likely than not. The evidence was not of a quality which proved appellant's guilt beyond a reasonable doubt. Therefore, I would reverse the judgment of sentence and discharge the appellant.

President Judge ROWLEY, and MONTEMURO and FORD ELLIOTT, JJ., join.