J-S24030-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| NAFEE ANTHONY DAVIS | : | No. 1487 MDA 2022 |

Appeal from the Order Entered October 20, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001621-2021

BEFORE: BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.: **FILED: AUGUST 18, 2023**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Dauphin County, granting Nafee Anthony Davis' post-verdict motion for acquittal and dismissing all charges lodged against him. Upon our careful review, we reverse the order of the trial court and remand for sentencing.

The trial court set forth the facts of this case as follows:

On March 22, 2021, members of the Pennsylvania Board of Probation and Parole and Dauphin County Adult Probation and Parole went to 1401 N. 15th Street in the City of Harrisburg for the purposes of conducting a parole/probation search. [Davis] began residing at that address in January 2021, and was presumably approved by state parole and/or county probation.[9] Prior to March 22, 2021, Pennsylvania Board of Probation and Parole Agent Rob Gerrity (hereinafter "Agent Gerrity") and APO

_____

[*] Former Justice specially assigned to the Superior Court.

[Rick] Anglemeyer visited [Davis] at his residence on at least six [] different occasions.

> [9] At the time of the search, [Davis] was serving house arrest and was required to remain at the approved residence. [At trial, the parties agreed to use the general term "law enforcement officers" to refer to the probation/parole officers so as not to alert the jury to Davis' status.]

Agent Gerrity's first [] visit to [Davis'] residence was on February 9, 2021. On direct-examination, Agent Gerrity testified that [Davis] was the only person at the residence on that date. However, during cross-examination, it was revealed that the state parole agents involved in this case did not turn over all of their notes of contacts to the Commonwealth, who then could not turn it over to [Davis]. As a result, this [c]ourt directed the state parole agents to provide the notes to both parties. Once the notes were provided, Agent Gerrity corrected his prior testimony and stated that there were three [] other occupants at the residence on February 9, 2021, but he did not record their names. Agent Gerrity was only in the living room, and the visit lasted approximately five [] to ten [] minutes.

The next day, February 10, 2021, APO Anglemeyer visited [Davis] at 1401 N. 15th Street for the first time. APO Anglemeyer testified that he observed marijuana and drug paraphernalia on the living room coffee table. [Davis] informed APO Anglemeyer that he had a medical marijuana card, and APO Anglemeyer counseled him on the proper use of medical marijuana. During the visit, [Davis] consented to a search of his bedroom and vehicle, and there was no evidence of any violation(s). APO Anglemeyer testified that [Davis'] bedroom was on the second [] floor toward the rear of the house.

On February 16, 2021, Agent Gerrity visited [Davis] at his residence. [Davis] was the only person present at that time and the visit lasted approximately five [] to ten [] minutes. Similar to the previous visit, Agent Gerrity testified that he was only in the living room.

Agent Gerrity's next visit to [Davis'] residence was on March 1, 2021. On direct-examination, Agent Gerrity testified that [Davis] was the only person present. However, after the notes were provided, Agent Gerrity corrected his testimony and stated that a cohabitant was also present, but he did not record their name.

Similar to previous visits, this visit lasted approximately five [] to ten [] minutes in the living room.

Two days later, on March 3, 2021, APO Anglemeyer visited [Davis] at his residence. APO Anglemeyer testified that he spoke to [Davis] at the front door and does not believe he went inside the residence that day.

Agent Gerrity's last visit before the search was on March 8, 2021. [Davis] was the only person present, and the visit lasted approximately five [] to ten [] minutes in the living room. On cross-examination, Agent Gerrity stated that his note said, "no other members of the household were present."

On March 22, 2021, Agent Gerrity, APO Anglemeyer, Pennsylvania Board of Probation and Parole Agent Caleb Tyson (hereinafter "Agent Tyson"), and Dauphin County Adult Probation and Parole Officer Brandon Rigel (hereinafter "APO Rigel") knocked on the door of 1401 N. 15th Street at around 9:40 A.M., and there was no response for approximately three [] to four [] minutes. When [Davis] opened the door, officers immediately smelled the odor of marijuana, and observed a grinder and a marijuana blunt in plain view. [Davis] was immediately detained and remained with Agent Gerrity while Agent Tyson, APO Anglemeyer[,] and APO Rigel performed a protective sweep of the residence for safety purposes, prior to conducting the planned search. No other individuals were in the residence at that time.

The residence at 1401 N. 15th Street is a two-story row home with a finished basement, connected only on one [] side to another row home. In the basement, there was an in-home recording studio in the common area, and a separate bedroom. During the protective sweep, officers observed a jar of medical marijuana on the desk of the recording studio, suitcases in the open closet, and three [] firearms laying on the floor in the basement bedroom in plain view. While officers were still at the residence, [Kyle] Oliver approached APO Anglemeyer and requested permission to enter. APO Anglemeyer denied him permission to enter. [] Oliver then informed APO Anglemeyer that he resided in the basement bedroom. There was an exterior door that led from the basement to the rear of the residence, where [Davis'] vehicle was parked. APO Anglemeyer did not know whether [Davis] had a valid driver's license or not.

The first floor consisted of the kitchen and living room. [No contraband] was found in the kitchen. As previously stated,

- 3 -

officers observed a marijuana grinder, a blunt wrapper, and an ashtray in plain view on the living room table. During the protective sweep, officers removed all the items from the closet by the front door and searched through a pink backpack, as well as a box that was in the closet. Inside the pink backpack was a plastic grocery bag filled with what appeared to be drug packaging materials. The box was located on the top shelf of the closet that contained a composit[ion] notebook, a firearm, a digital scale box, and a guilty plea colloquy for an individual known as William Davis.[12] The composit[ion] notebook contained numerous writings in various handwritings. There was no attempt to obtain a handwriting exemplar to investigate the various handwritings found in the notebook. None of [Davis'] personal belongings were found in the living room closet.

[12] William Davis has no relation to [the defendant].

On the second floor, there were three [] bedrooms—front, rear, and north—and a bathroom. During the protective sweep of the second [] floor, officers observed a box of 9mm ammunition on a side night table in the front bedroom, consistent with the Glock 9mm found in the living room closet. While officers were still on scene, [] Oliver handed his phone to APO Anglemeyer to speak with a female on the other end. The female identified herself as Melina Mendoza [] and informed APO Anglemeyer that she resided in the second-floor front bedroom, and legally owned a firearm (the Glock 9mm) that would be found in the living room closet.

As a result of the evidence observed in plain view, as well as evidence that was secreted in a bookbag and a box in the living room closet, APO Anglemeyer contacted Officer Jeremy Crist [] of the City of Harrisburg Bureau of Police. Officer Crist arrived on scene and was provided information by APO Anglemeyer. Based on the information provided to him, Officer Crist applied for four [] separate search warrants [for]: (1) the common areas; (2) the basement bedroom[,] which [was] identified [as belonging to] Oliver[;] (3) [the] second[-]floor front bedroom (belonging to [] Mendoza); and (4) [the] second[-]floor rear bedroom[,] which [was] identified [as belonging to Davis].

[The search of Davis' residence yielded an abundance of evidence of marijuana trafficking. In the basement bedroom, identified as belonging to Oliver, the search uncovered, *inter alia*: three one-pound bags of marijuana, multiple firearms, ammunition, and $1,396 in cash. In the basement common area, the search

uncovered, *inter alia*: Davis' expired identification card, two medical marijuana containers, a grinder, rolling papers, and luggage containing plastic bags with marijuana residue. The living room closet contained, *inter alia*: a backpack containing drug packaging materials, a shoebox containing a digital scale, a composition notebook, a firearm, and a backpack containing $2,000. Recovered in plain view in the living room was a marijuana grinder on a coffee table. The "futon room" [on the second floor] contained a grinder with marijuana residue and vacuum sealed bags with marijuana residue. In the second-floor-front bedroom, purportedly belonging to Mendoza, the search uncovered, *inter alia*: ammunition, a composition book containing a drug ledger, seven amphetamine pills, a total of $65,000 in cash, and labels used to package marijuana. Nothing was recovered from Davis' bedroom.]

Detective John Goshert [] testified on behalf of the Commonwealth as an expert in street[-]level drug trafficking. He opined that the marijuana recovered from 1401 N. 15th Street was possessed with the intent to distribute it. However, Detective Goshert also testified that[,] based on the evidence he reviewed, it appeared that the marijuana was being sold by the pound[,] as opposed to the typical street-level dealing where it[ is] sold by the gram. He further opined that it was a "very sophisticated operation" and likely involved more than one [] person.

Officers recovered a total of five [] firearms from [] Oliver's basement bedroom: (1) a 9mm pistol inside a backpack; (2) a semiautomatic shotgun (Citadel) on the floor; (3) a bolt-action rifle (Creedmoor) on the floor; (4) a semiautomatic AR-15 on the floor; and (5) a Mossberg shotgun in a case behind the TV. During the investigation, Officer Crist was informed by [] Oliver that Jlynn McDonald [] was his girlfriend. Two [] of the firearms recovered from the basement bedroom were registered to [] McDonald—the 9mm pistol and bolt-action rifle. Inside the backpack with the 9mm pistol were medical records and a prescription bottle for Ms. McDonald.

Additionally, [] Oliver claimed ownership of the remaining three [] firearms recovered from his bedroom, and informed Officer Crist that he purchased the Citadel shotgun and the AR-15. An additional firearm was recovered from the living room closet—a 9mm pistol registered to [] Mendoza. [] Oliver was charged with possession of the marijuana found in his basement bedroom, but

[] McDonald was not. Significantly, there was no evidence with [Davis'] name on it [] recovered from [] Oliver's bedroom.

In the basement studio, officers recovered [Davis'] expired identification card, as well as two [] medical marijuana containers. Despite the medical marijuana containers having labels with identifying information on them, apparently Officer Crist chose not to investigate [the identity of the patient].

The only evidence in the second [] floor front bedroom ([identified as] Mendoza's bedroom) that had [Davis'] name on it was a Dauphin County Treasury bill addressed to [Davis] and Charles Morrison [] for a property at 18 Evergreen Street. The bill was mailed to 929 Norwood Street. During the investigation, Officer Crist learned that [] Morrison is [Davis'] adopted brother, and that they jointly own the property at 18 Evergreen Street. Officer Crist did not check the Recorder of Deeds to obtain a copy of the deed for 18 Evergreen Street. At trial, Officer Crist was shown a copy of the deed and indicated that it was a quit claim deed—a brother to brother transfer from Joseph Davis to [] Morrison and [Davis].

Officers also recovered the identification card and [S]ocial [S]ecurity card for Katiria Maldonado-Davila [] in the second [] floor front bedroom ([]Mendoza's bedroom). During the investigation, Officer Crist learned that [] Maldonado-Davila was [Morrison's] girlfriend[.] However, Officer Crist did not interview [] Morrison or [] Maldonado-Davila during the investigation to find out why her personal information was in [] Mendoza's bedroom. Further, there was no evidence with [Davis'] name on it recovered from the second [] floor north bedroom (["]futon room["]).

Of all the evidence that was collected—six [] firearms, numerous plastic bags, storage containers, ammunition boxes, notebooks, packaging labels, etc.—only the [two] 9mm pistols were processed for fingerprinting. No latent prints were found. Officer Crist explained that he did submit the other four [] firearms for fingerprinting, but there was a "packaging snafu" that made the firearms unable to be processed.

Although Officer Crist had the capability to collect trace DNA from the firearms for analysis, he chose not to do so. He explained that he did not request them to be processed because: (1) it would not have be uncommon for [Davis'] DNA to be on the firearms since he resided at 1401 N. 15th Street; (2) the Pennsylvania State Police lab would not prioritize the testing because it was not a homicide or aggravated assault; and (3) it "doesn't seem logical

for the possibility for there to be actual reason for his DNA to be on the weapons."

Despite Officer Crist having evidence that at least six [] and possibly up to nine [] other individuals had access to 1401 N. 15th Street—[] Oliver, [] Mendoza, [] Morrison, [] Maldonado-Davila, [] McDonald, [] William Davis, the three [] unnamed occupants at the residence on February 9, 2021, and the unnamed cohabitant at the residence on March 1, 2021—he chose to only interview [] Oliver and [] Mendoza, and did not investigate any of the other individuals to determine what level of access they may have had to the residence.

At some point during the protective sweep or ultimate search, officers obtained possession of [Davis'] keyring and discovered that one [] of his keys opened the back door of the residence. That same key was not examined to see if it also opened the front door, nor was it collected as evidence. Additionally, four [] to five [] other sets of keys were photographed throughout the residence, but were not seized []or tested to see if they opened the front and/or back doors. Further, the only evidence testified to in [Davis'] bedroom w[as] a vape pen and loose marijuana, which were not collected as evidence.

Trial Court Opinion, 1/12/23, at 4-15 (citations to record and some footnotes omitted).

A jury trial was held from September 19-22, 2022. At the conclusion of the Commonwealth's case, the trial court granted Davis' motion for judgment of acquittal as to a charge of possession of a controlled substance (amphetamine).[1] The jury subsequently convicted Davis of person not to possess firearm,[2] possession with intent to deliver a controlled substance

---

[1] The Commonwealth does not challenge the trial court's grant of judgment of acquittal as to this charge.

[2] 18 Pa.C.S.A. § 6105.

("PWID"),[3] and possession of drug paraphernalia.[4] After the verdict was announced, Davis moved for judgment of acquittal on the remaining charges. After briefing by both parties, the trial court granted Davis' motion on October 20, 2022, and dismissed the charges against him. The Commonwealth filed a timely notice of appeal, and both the Commonwealth and the trial court have complied with Pa.R.A.P. 1925.

The Commonwealth raises the following claim for our review:

> Whether the trial court erred in granting [Davis'] post-verdict motion for acquittal and dismissing all charges where [the Commonwealth] presented weighty and sufficient evidence to sustain [Davis'] convictions for persons not to possess firearms, possession with intent to deliver a controlled substance, and possession of drug paraphernalia[, and] the jury weighed the evidence and concluded that it established [Davis'] guilt beyond a reasonable doubt, and[, thus,] the trial court [] erred in reweighing the evidence[.]

Brief of Appellant, at 4.

Our standard of review when considering the Commonwealth's claim that the trial court erred in granting a motion for judgment of acquittal is as follows.

> A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light

---

[3] 35 P.S. § 780-113 (a)(30).

[4] *Id.* at § 780-113(a)(32).

most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Hutchinson*, 947 A.2d 800, 805–06 (Pa. Super. 2008) (citation omitted).

Here, Davis was convicted of PWID, possession of drug paraphernalia, and person not to possess firearm. To sustain a conviction for PWID, "the Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance." *Commonwealth v. Roberts*, 133 A.3d 759, 767 (Pa. Super. 2016) (citation omitted).

Possession of drug paraphernalia is defined as:

The use of, or possession with intent to use, drug paraphernalia for the purpose of planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act.

35 P.S. § 780–113(a)(32). Drug paraphernalia is defined as:

all equipment, products and materials of any kind which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act. . . .

In determining whether an object is drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors, statements by an owner or by anyone in control of the object concerning its use . . . the proximity of the object, in time and space, to a direct violation of this act, the proximity of the object to controlled substances, the existence of any residue of controlled substances on the object, direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons who he knows, or should reasonably know, intend to use the object to facilitate a violation of this act . . . the existence and scope of legitimate uses for the object in the community, and expert testimony concerning its use.

35 P.S. § 780–102.

"To sustain a conviction for possession of drug paraphernalia[,] the Commonwealth must establish that items possessed by defendant were used or intended to be used with a controlled substance so as to constitute drug paraphernalia and this burden may be met by Commonwealth through circumstantial evidence." *Commonwealth v. Little*, 879 A.2d 293, 300 (Pa. Super. 2005).

Finally, the Crimes Code defines persons not to possess firearms, in pertinent part, as follows:

(a) Offense defined.

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not

- 10 -

possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

* * *

(c) Other persons.--In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):

* * *

(2) A person who has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years.[5]

18 Pa.C.S.A. §§ 6105(a)(1) & (c).

Davis was convicted of three possessory offenses. It is well-settled that in the context of such prosecutions, "the Commonwealth may meet its burden by showing actual, constructive, or joint constructive possession of the contraband." ***Commonwealth v. Vargas***, 108 A.3d 858, 868 (Pa. Super. 2014) (en banc) (quotation and quotation marks omitted).

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion." We subsequently defined "conscious dominion" as "the power to control the contraband and the intent to exercise that control." To aid application, we have held that constructive possession may be established by the totality of the circumstances.

---

5 On May 28, 2020, Davis entered a guilty plea to one count of PWID (marijuana). ***See*** N.T. Trial, 9/22/22, at 572.

- 11 -

*Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa. Super. 2012) (quotation omitted). "The Commonwealth may sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence received against the defendant." *Id.* (citation omitted).

Nevertheless, "where more than one person has equal access to where drugs are stored, presence alone in conjunction with such access will not prove conscious dominion over the contraband." *Vargas*, 108 A.3d at 868, quoting *Commonwealth v. Davis*, 480 A.2d 1035, 1045 (Pa. Super. 1984) (emphasis omitted). Rather, for the Commonwealth to prove constructive possession where more than one person has access to the contraband, "the Commonwealth must introduce evidence demonstrating either [the defendant's] participation in the drug[-]related activity or evidence connecting [the defendant] to the specific room or areas where the drugs were kept." *Vargas*, 108 A.3d at 868, quoting *Commonwealth v. Ocasio*, 619 A.2d 352, 354–355 (Pa. Super. 1993).

> [A]lthough "mere presence" at a crime scene cannot alone sustain a conviction for possession of contraband:
>
> > a jury need not ignore presence, proximity and association when presented in conjunction with other evidence of guilt. Indeed, presence at the scene where drugs are being processed and packaged is a material and probative factor which the jury may consider. Drug dealers of any size and [illegal drug] manufacturers probably are reticent about allowing the unknowing to take view of or assist in the operation.

***Vargas***, 108 A.3d at 869, quoting ***United States v. Robinson***, 978 F.2d 1554, 1557–58 (10th Cir. 1992) (internal quotations and citations omitted).

In reaching its conclusion that Davis' convictions were not supported by the evidence, the trial court reviewed numerous constructive possession cases and concluded that "[t]his case is significantly different." Trial Court Opinion, 1/12/23, at 19. Specifically, the court noted, *inter alia*, the following factors: (1) the lack of fingerprint or DNA evidence connecting Davis to the contraband; (2) clear evidence that others resided in the bedrooms where the vast majority of the contraband was found; (3) the lack of any contraband in Davis' bedroom; (4) Oliver's statement to Officer Anglemeyer that everything in the basement bedroom belonged to him; (5) Oliver's PennDOT change of address, which pre-dated Davis' presence at the residence, identifying 1401 N. 15th Street as his address; and (6) the items recovered from the front bedroom were consistent with Mendoza's ownership of the room. Moreover, the court noted that the Commonwealth's emphasis on the fact that Davis was the sole person present in the residence during each of the visits made by law enforcement was disingenuous, as Davis was on house arrest and was required to be there.[6]

_____

[6] The trial court stated in its opinion:

> By repeatedly exploiting the reality that [Davis] was unable to leave his residence, the Commonwealth placed [him] in an unfair position—violate his constitutional rights by informing the jury he was on state parole and required to be on house arrest or say

*(Footnote Continued Next Page)*

The court concluded:

> In sum, this [c]ourt finds that the Commonwealth's case rests on inferences upon inferences, and that the inferences the Commonwealth asks this [c]ourt to draw do not flow from the facts and circumstances presented at trial. [T]hey are not of the volume and quality to overcome the presumption of innocence. This [c]ourt does not take this issue lightly, nor does it desire to substitute its conclusions for the jury's. Instead, we must follow the guidance of our appellate courts, and objectively analyze the evidence without unsupported conjecture. The two [] co-defendants, to which the evidence points [] directly, have not been brought to trial to answer on their charges, nor were they joined for trial with this case. Nevertheless, we are constrained to conclude that the evidence is insufficient, as a matter of law, to support the convictions against [Davis].

*Id.* at 29-30.

In its brief, the Commonwealth relies on two cases in which our Supreme Court found constructive possession and argued that the facts underlying the instant matter are "more compelling." Brief of Appellant, at 23. In ***Commonwealth v. Macolino***, 469 A.2d 132 (Pa. 1983), the defendant was convicted of PWID and criminal conspiracy based on the following factual scenario:

> Armed with a search warrant, police searched [Macolino's] home on October 29, 1979. In the first[-]floor dining room, the police seized various items linking Carl and Gae Macolino[, Macolino's wife and co-defendant,] together as a couple, including bank checks, deposit slips, a bank passbook in both their names[,] and photographs of the couple. Large sums of money were also seized. In the master bedroom[,] which was equipped with a double bed, there was a clothes closet with the clothing of both a

---

nothing and allow the Commonwealth to argue that he had to be in control of the entire residence.

Trial Court Opinion, 1/12/23, at 25.

- 14 -

man and woman. On the top shelf of the closet[,] police seized two plastic bags containing a white powder, testified at trial to be thirty-percent cocaine. Two smaller plastic packages were found in the closet as well, containing what was testified to be two percent cocaine, along with a Tupperware container holding four empty plastic bags. Copies of "The Pleasures of Cocaine" and "The Pill Book" were seized from a bookshelf in the bedroom. On top of the bedroom dresser, the officers seized a pocket memo book, containing pages of numbers, a machine called a "Daisy Seal-a-Meal," an appliance used in the drug trade to seal packages of cocaine in order to prevent seepage of the drug, and a device used to detect eavesdropping equipment on a telephone called an "Eavesdropper Stopper." In the attic, police seized two one-pound containers of mannitol, a substance used as a cocaine "cutting" agent.

*Id.* at 133-34.

This Court reversed Macolino's convictions on the basis that there was insufficient evidence to establish constructive possession, as Macolino's "wife had equal access to the drugs, and . . . the inference was just as strong that the drugs belonged to her as to her husband." *Id.* at 135 (quotation marks omitted). The Supreme Court granted the Commonwealth's petition for allowance of appeal as to the PWID charge and noted that the issue of constructive possession of contraband seized in an area jointly controlled by husband and wife was an issue of first impression in Pennsylvania. After reviewing similar cases from other jurisdictions, the Court concluded that "constructive possession can be found in one defendant when both the husband and wife have equal access to an area where the illegal substance or contraband is found." *Id.* at 135. The Court stated that "[t]he facts of this case involve a husband and wife who had joint and exclusive control of a

residence, who alone were present at the time of the police search, in conjunction with other evidence sufficient to establish a link between [] Macolino and the illegal substance." *Id.* at 136.

> [T]he fact-finder, examining all of the evidence in its totality, could reasonably conclude that [Macolino] was aware of the cocaine, along with the items found in his bedroom[,] which are commonly used in cocaine use and trafficking, that he exercised a conscious dominion over the illegal substance[,] and that he intended to possess it.

*Id.*

The Commonwealth also relies on *Commonwealth v. Mudrick*, 507 A.2d 1212 (Pa. 1986). The charges there arose when police arrived at the residence of the defendant's paramour, Sandra Dietz, to serve a New Jersey fugitive warrant on Dietz.

> They knocked; [Mudrick] answered the door. After the officers explained their purpose, [Mudrick] told them that [] Dietz was sleeping in the bedroom and directed them to it. [Mudrick] was wearing only a pair of blue jeans. Some of the officers entered the bedroom, woke [Dietz], and placed her under arrest. [] Dietz was taken to the District Magistrate after dressing and using the bathroom. [Mudrick] told another officer that he lived with [] Dietz and they were going to be married. He also mentioned that one of the dogs on the premises was his. The officers saw a box of what they believed to be marijuana on the living room coffee table. [Mudrick] was ordered to sit down; he sat within two feet of the contraband. One officer remained on the premises with [Mudrick] while others obtained a search warrant. While waiting for the officers to return, [Mudrick] got up, walked into the kitchen and helped himself to a cold drink from the refrigerator. At about 3:00 P.M. the officers returned with a search warrant for the residence. In addition to the box on the coffee table, they found what proved to be cocaine in the bedroom and the study. The suspected contraband was confiscated and [Mudrick] was arrested. He retrieved his clothes from the bedroom in which

Dietz had been sleeping. This was the only room in the residence in use as a bedroom. Subsequent chemical analysis showed that the substances seized were marijuana and cocaine.

At trial, [Mudrick] presented evidence that he actually lived in Blakeslee in the home of one Patrick Simonik, and that he paid room and board to Simonik and took meals there.

*Id.* at 1212-13.

This Court reversed Mudrick's judgment of sentence on the basis that "the Commonwealth proved no more than [Mudrick's] presence at the scene, and the evidence was insufficient to establish constructive possession." *Id.* at 1213. The Supreme Court granted allowance of appeal to the Commonwealth and reinstated Mudrick's convictions, holding that "even in the absence of a marital relationship[,] constructive possession may be found in either or both actors if contraband is found in an area of joint control and equal access." *Id.* at 1214. The Court concluded that the fact that Mudrick exclusively shared the residence, in which contraband was found in the bedroom, study, and living room, was sufficient to enable a factfinder to find joint control and equal access to the contraband, thus establishing constructive possession.

In response, Davis argues that there was no direct or circumstantial evidence proving any connection between him and the contraband or drug activity related thereto. No firearms, marijuana, or other contraband was found in Davis' bedroom, or in any area over which Davis had "exclusive control." Brief of Appellee, at 28. Davis argues that there was no evidence of his intent to exercise control over the contraband. "At best . . . the evidence

presented at trial, as to Davis, was equally consistent with his innocence as it was with any guilt." *Id.*, citing *In Interest of J.B.*, 189 A.3d 390, 415 (Pa. 2018) (where evidence of record, viewed in light most favorable to Commonwealth with all reasonable inferences, is, at most, equally consistent with guilt and innocence, Commonwealth has not sustained burden of proof beyond reasonable doubt). Davis argues that it is unreasonable to infer that he was the only resident of the home, as Officer Crist "conceded that there were possibly ten other individuals living in the residence, or had equal access to the contraband . . . as Davis." *Id.* at 30.

In support of his argument, Davis relies on this Court's decision in *Ocasio*, *supra*, in which we set forth the facts as follows:

> On February 2, 1989[,] the Philadelphia Police Department executed a search warrant for 2128 North Second Street in Philadelphia. During the search, the officers required the five occupants of the house, including Abel Ocasio (hereinafter "co-defendant"), to remain in the living room. While the officers were searching the first floor, Officer Ralph Perez overheard co-defendant state in Spanish, "it's in the trash." Officer Perez then directed another officer to search the trash can in the kitchen. The police discovered twelve baggies containing a total of 567 vials of crack cocaine hidden in the trash can. In a third[-]floor bedroom, the officers found a baggie containing a large chunk of crack cocaine laying out in the open and $5,882 in cash. In addition, the officers recovered from the basement a triple beam scale, one baggie containing numerous empty clear plastic vials with gray and black caps, two strainers, and one baggie containing numerous empty clear smaller packets.
>
> The 567 vials found in the kitchen contained approximately 56.7 grams of crack cocaine and the baggie found in the third[-]floor bedroom contained 113.2 grams of crack cocaine. The black plastic grinding apparatus recovered during the search contained residue of cocaine and the glass bottle confiscated during the

search contained 5.35 grams of Tetracaine, a substance commonly used to dilute or "cut" cocaine before selling it.

Appellant returned home while the search was in progress and he was subsequently arrested. During a search of appellant, police recovered $422 in cash and a current driver's license listing his residence as 2128 North Second Street.

*Id.* at 353.

Ocasio was convicted of possession of drug paraphernalia and conspiracy. On appeal, he argued, *inter alia*, that the evidence was insufficient to convict, and this Court agreed, finding that the Commonwealth failed to introduce evidence demonstrating either Ocasio's participation in the drug-related activity or connecting him to the specific room or areas where the drugs were kept. The Court stated:

After carefully examining all of the circumstances in the instant action, we find that the Commonwealth has established no more than a mere suspicion that appellant agreed to participate or aid in the drug distribution. As a resident of the house, appellant's presence at the scene of the crime was not out of the ordinary. In fact, he was one of six individuals present during the search. Moreover, there is no evidence that appellant even knew of the criminal activity in the house. *See Commonwealth v. Fortune*, [] 318 A.2d 327, 329 ([Pa.] 1974) (a defendant's residence at the house where contraband is found does not establish that he had knowledge of any criminal activity). Nothing connecting appellant to the drugs or the drug paraphernalia was found anywhere in the house. As stated above, the $422 in small denominations could suggest that appellant was involved in drug sales. However, this inference is not supported by any other evidence. In light of the lack of direct and circumstantial evidence connecting appellant to any drug related activity, the evidence introduced at trial is insufficient to support appellant's conviction of criminal conspiracy.

*Id.* at 355.

Here, while we are sympathetic to the trial court's evident frustration with the Commonwealth regarding certain aspects of its investigation and prosecution of this matter, we are constrained to conclude that the court erred in granting Davis' motion for acquittal. Contrary to Davis' argument, the jury need not have found that Davis had **exclusive** possession of the areas in which contraband was found, or that he was the only resident of the dwelling, to conclude that he was guilty of possessing the contraband. Similarly, the fact that no contraband was found in Davis' bedroom is not dispositive. Indeed, the facts of this case are closely analogous to those in *Commonwealth v. Aviles*, 615 A.2d 398, 402 (Pa. Super. 1992) (en banc).

In *Aviles*, appellant was convicted of possession of a controlled substance, PWID, and possession of drug paraphernalia on the following facts:

[A]t 7:30 p.m. on the 23rd of January, 1989, Police Officer Daniel McEwen, in the company of five other officers, arrived at 181 West Wishart Street, Philadelphia, to execute a search warrant obtained on the strength of a first-time informant's account of drug activity and follow-up surveillances by Officer McEwen.

Once at the site, Officer McEwen knocked on the front door and announced, "Police." [] Aviles opened the door and was informed that the police were requesting entry into the house. Consent was given. All those present were advised to remain calm and that the police had a search warrant. At this time, [] Aviles addressed Officer McEwen: "She said don't talk to anyone else, talk to me. This is my place."

A team of officers conducted a search of the premises. Within 10 minutes of their arrival, Officer McEwen was called to the second floor, rear bedroom and Officer Tames pointed to an open dresser drawer containing a brown metal box. The box was found to contain [drugs and drug paraphernalia, including plastic packets containing white powder and sealed with gold tape, sandwich bags

- 20 -

containing white powder, a glass bottle containing white powder, and grinders and a screen containing white residue].

Officer Tames stated that the door to the rear bedroom was open and he "did not break any lock." With regard to the metal box, Officer Tames testified: ["W]hen I got the box out of the drawer . . . it was closed and I just pulled this [latch] up like that and opened it. . . . I didn't pry it open. I just opened it.["]

Then, Officer McEwen proceeded to the second bedroom, which was the middle bedroom on the same floor. There[, Officer] McEwen observed Sergeant Perez "on his hands and knees removing floorboards . . . from the eastern-most wall of that room." Retrieved from under the floor was an "open toolbox" containing $10,538 in cash. [Officer] McEwen also found a second box in the middle bedroom which contained[ a scale, an electric heat-sealer with a plug, two strainers, a screen, hundreds of empty, clear plastic packets, and twelve rolls of gold tape.]

Sergeant Perez was the first officer to enter the middle bedroom, and, in respect thereto, he stated that he did not have to force the door open to get in: "The door [he] went into, to get into the room, [he] didn't break."

The police found proof that Aviles resided at the stated address. Likewise, [] Aviles admitted being the lessee and that, for approximately 5 years prior to the search, she had rented the rear and middle bedrooms for $35 a week to supplement her receipt of $474 a month from the Department of Public Welfare. She and her [three] children slept on the second floor, front bedroom[,] next to the middle and rear bedrooms[ in which the drugs and paraphernalia were found].

[] Aviles testified that the rear and middle bedrooms had been rented to her sister [] and brother-in-law [] from the beginning of December, 1988 until the police arrived. She denied having any knowledge of the drugs, the location of the drug paraphernalia[,] or the sawed-out floor-compartment wherein the money was hidden.

It was [the belief of Aviles' son,] Jorge[,] that the sawed-out floor-boards in the middle bedroom had been perpetrated by the police during their search since, he claimed, no such opening existed prior thereto. This was confirmed by Aviles' sister[,] who rented the same two bedrooms from 1987 until 1988 and noticed no floorboards having been sawed through and used as a storage

area. On the other hand, the police testified to the contrary: [Officer] McEwen "didn't observe any sawdust or fresh type markings [in the floorboards]. They appeared to be well worn[, i.e., he] wouldn't say it was recently cut."

Lastly, Aviles testified that locks were placed on the doors to the rear and middle bedrooms by her sister immediately upon renting the rooms; she denied having any keys to the locks; she denied selling drugs; and she did not know about the metal boxes or the hole in the floor in the middle bedroom or its contents.

*Id.* at 399–401.

A three-judge panel of this Court, with one dissent, reversed Aviles' judgment of sentence. On petition of the Commonwealth, we granted en banc review. Applying the principles enunciated in **Mudrick**, **supra**, the Court en banc concluded that, "when viewed under the totality of the circumstances and drawing all reasonable inferences therefrom[,] bounded only by the 'realities' of drug activity and its attendant variables," the evidence was sufficient to prove that Aviles had joint control over, and equal access to, the areas where the contraband was found. **Aviles**, 615 A.2d at 403.

The factfinder could properly find that [] Aviles and her sub-lessees not only had control and access to all the bedrooms[,] *but the whole residence*. Thus, analyzing all the circumstances, the trial court could infer [] Aviles' constructive possession of the cocaine, drug paraphernalia[,] and money[,] which were openly accessible to her in the rear and middle bedrooms.

*Id.* (emphasis in original)

Here, as in **Aviles**, no contraband was discovered in the bedroom identified as belonging to the defendant. Nevertheless, in both cases, the defendant had unrestricted access to all of the areas in which contraband was found. Indeed, the facts here are more compelling than in **Aviles**, as

- 22 -

contraband was found not only in unlocked, freely accessible bedrooms belonging to other residents, but throughout the other common areas of the house. In the matter *sub judice*, Davis had unfettered access to the two other second-floor bedrooms adjacent to his, in which large amounts of cash, ammunition, drug paraphernalia, a drug ledger, and drug packaging materials were found. He had similarly free access to the living room and its closet, in which cash and drug paraphernalia were found, some in plain view on the coffee table. Finally, property belonging to Davis, including an expired identification card and medial marijuana containers, was found in the basement common area, in which marijuana and luggage containing plastic bags with marijuana residue were also found. And, although evidence tended to show that the basement bedroom belonged to Kyle Oliver, Davis also had unfettered access to that room, in which firearms, ammunition, approximately $1,400 in cash, and at least three pounds of marijuana were uncovered.

In light of the foregoing, viewed in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, "bounded only by the 'realities' of drug activity and its attendant variables," *id.* at 403, the jury could have reasonably concluded that Davis had joint control and equal access to the areas in which the contraband was found and intent to exercise that control and, thus, that he was in constructive possession of the contraband. *See Mudrick*, *supra*.

Order reversed. Convictions reinstated. Case remanded for sentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/18/2023